# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP2132 |

| | |
|---|---|
| COMPLETE TITLE: | In re the Paternity of B. J. M.: |
| | |
| | Timothy W. Miller, |
| |      Joint-Petitioner-Appellant, |
| |   v. |
| | Angela L. Carroll, |
| |      Joint-Petitioner-Respondent- |
| | Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 386 Wis. 2d 267,925 N.W.2d 580
PDC No:2019 WI App 10 - Published

| | |
|---|---|
| OPINION FILED: | June 16, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 13, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Barron |
|   JUDGE: | Michael J. Bitney |

JUSTICES:

DALLET, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., and ZIEGLER, J., joined; and in which ANN WALSH BRADLEY, J., joined except for footnote 18. ANN WALSH BRADLEY, J., filed a concurring opinion. ZIEGLER, J., filed a concurring opinion. DALLET, J., filed a concurring opinion, in which HAGEDORN, J., joined. HAGEDORN, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, and KELLY, JJ., joined except for footnote 1 and ¶¶120-24, but do join footnote 3.

NOT PARTICIPATING:

ATTORNEYS:

For the joint-petitioner-respondent-petitioner, there were briefs filed by *Brandon M. Schwartz, Michael D. Schwartz,* and *Schwartz Law Firm*, Oakdale, Minnesota. There was an oral argument by *Brandon M. Schwartz.*

For the joint-petitioner-appellant, there was a brief filed by *Stephanie L. Finn, David J. Rice, Terry L. Moore*, and *Herrick & Hart, S.C.*, Eau Claire. There was an oral argument by *Terry L. Moore*.

An amicus curiae brief was filed on behalf of Wisconsin Chapter of American Academy of Matrimonial Lawyers by *Daniel P. Bestul* and *Duxstad & Bestul, S.C.,* Monroe; with whom on the brief was *Jennifer Van Kirk* and *Peckerman, Klein & Van Kirk LLP*, *Milwaukee.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2017AP2132
(L.C. No. 2011PA46PJ)

STATE OF WISCONSIN : IN SUPREME COURT

In re the Paternity of B.J.M.:

Timothy W. Miller,

       Joint-Petitioner-Appellant,

  v.

Angela L. Carroll,

       Joint-Petitioner-Respondent-
Petitioner.

**FILED**

**JUN 16, 2020**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion of the Court, in which ROGGENSACK, C.J., and ZIEGLER, J., joined; and in which ANN WALSH BRADLEY, J., joined except for footnote 18. ANN WALSH BRADLEY, J., filed a concurring opinion. ZIEGLER, J., filed a concurring opinion. DALLET, J., filed a concurring opinion, in which HAGEDORN, J., joined. HAGEDORN, J., filed a dissenting opinion, in which REBECCA GRASSL BRADLEY, and KELLY, JJ., joined except for footnote 1 and ¶¶120-24, but do join footnote 3.

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 REBECCA FRANK DALLET, J. This case presents an issue of first impression: an allegation of judicial bias arising from a circuit court judge's undisclosed social media connection with a litigant.

¶2    In this case, a circuit court judge accepted a Facebook "friend request" from the mother in a custody dispute after a contested hearing, but before rendering a decision.[1]  In the course of their 25-day Facebook "friendship," the mother "liked" 16 of the judge's Facebook posts, "loved" two of his posts, commented on two of his posts, and "shared" and "liked" several third-party posts related to an issue that was contested at the hearing.  The judge never disclosed the Facebook friendship or the communications, and he ultimately ruled entirely in the mother's favor.

¶3    After discovering the Facebook friendship, the father moved the circuit court for reconsideration, requesting judicial disqualification and a new hearing.  At the reconsideration hearing, the judge admitted to the Facebook interactions between himself and the mother.  However, he denied the motion and claimed that he was impartial because he had already decided on his ruling prior to accepting her friend request.

¶4    The court of appeals reversed the circuit court's denial of the motion for reconsideration and remanded the case with directions that it proceed before a different circuit court judge.[2]

---

[1] Judge Michael Bitney of the Barron County Circuit Court presided.

[2] _Miller v. Carroll_, 2019 WI App 10, 386 Wis. 2d 267, 925 N.W.2d 580.

¶5    We conclude that the extreme facts of this case rebut the presumption of judicial impartiality and establish a due process violation.   Accordingly, we affirm the court of appeals.

I.   FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶6    Timothy Miller and Angela Carroll stipulated to joint legal custody and shared physical placement of their minor son, Bruce, in August 2011.[3]   Five years later, Carroll filed a motion to modify the order pursuant to Wis. Stat. § 767.451 (2017-18).[4] Carroll sought sole legal custody, primary physical placement, child support payments, and a change in residence.   Carroll's motion and supporting affidavits alleged that Miller engaged in acts of domestic violence against Carroll, and included a copy of a domestic abuse injunction that Carroll obtained that same month.   Carroll also alleged that Miller failed to adequately parent and discipline Bruce.   Miller vigorously opposed the motion and disputed the allegations of domestic violence.   The case was assigned to Judge Michael Bitney.

¶7    Judge Bitney conducted a highly contested two-day evidentiary hearing over June 7-8, 2017, that included the testimony of 15 witnesses.   At the conclusion of the hearing, Judge Bitney took the matter under advisement and gave the parties time to submit briefs, which they filed on June 16,

---

[3] For consistency, we will use the same pseudonym for the parties' minor son as utilized by the court of appeals.   Miller, 386 Wis. 2d 267, ¶1 n.1.

[4] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

2017. Three days after the briefs were filed, unbeknownst to Miller, Carroll sent Judge Bitney a "friend request" on Facebook. Judge Bitney affirmatively "accepted" Carroll's request.[5] At the time Judge Bitney accepted the request, he had not yet rendered a decision on Carroll's motion. Judge Bitney never disclosed Carroll's request or his acceptance of the request.

¶8 During the 25 days between Judge Bitney's acceptance of Carroll's friend request and his issuance of a written decision entirely in her favor, Carroll engaged with and "reacted to" at least 20 of Judge Bitney's Facebook posts.[6] The bulk of Carroll's "reactions" to Judge Bitney's posts were "likes" to prayers and Bible verses that he posted.[7]

---

[5] Facebook friendship is established by the acceptance of a previously sent "friend" request. See Law Offices of Herssein & Herssein, P.A. v. United Servs. Auto. Ass'n, 271 So. 3d 889, 895 (Fla. 2018).

[6] Facebook users can click a "like" button, which is represented by a thumbs-up icon, to "like" a Facebook page or post. See Bland v. Roberts, 730 F.3d 368, 385 (4th Cir. 2013). In 2016, Facebook also included other "reactions" in addition to the "like" button: Love, Haha, Wow, Sad, or Angry. https://about.fb.com/news/2016/02/reactions-now-available-globally/.

As the parties admit, the record may not include all of Carroll's Facebook activity with Judge Bitney.

[7] Some of the posts that Carroll "liked" include:

- Dear Lord, give me this day the grace to be charitable in thought, kind in deed and loving in speech toward all. Amen.

4

Additionally, Carroll "loved" one of Judge Bitney's posts reciting a Bible verse and another post regarding "advice" to children and grandchildren.[8] Carroll also commented on two of Judge Bitney's posts related to his knee surgery: "Prayers on a healthy recovery Judge!!" and "Hope u get some rest and feel better as the days go on." Judge Bitney would have received a notification from Facebook each time Carroll reacted to one of

---

- Whoever sows sparingly shall reap sparingly, whoever sows generously will reap generously. God loves a cheerful giver!

- Lord, may I be a doer of your word and not a hearer only.

- Dear Lord, restore us by the repose of sleep after our day's work is done so that renewed by your help I may serve you in body and soul through Christ our Lord. Amen.

- May the Gospel transform our lives that we may witness it to those around us. Amen

- Come to me all you who labor and are burdened, and I will give you rest. Matthew 11:28.

- Lord Jesus you have chosen me to be your disciple. Take & use what I can offer, however meager it may be for the greater glory of your name.

[8] Carroll "loved" the following Bible verse that Judge Bitney posted: "Fear no one. Matthew 10:26."

5

his posts.[9] Judge Bitney also would have received a notification from Facebook each time Carroll commented on one of his posts.

¶9 In addition to "reacting" to and engaging with at least 20 of Judge Bitney's posts, Carroll posted on her Facebook page about the topic of domestic violence, which was at issue in the contested hearing. Carroll posted that she was "interested in" attending the "Stop the Silence Domestic violence awareness bike/car Run."[10] Carroll "liked" a third-party post related to domestic violence and reacted "angry" to a third-party post entitled "Woman dies two years after being set on fire by ex-boyfriend." Finally, Carroll "shared" a third-party post related to domestic violence.[11] Carroll's Facebook friends, including Judge Bitney, could see these "reactions" to, and "shares" of, third-party posts in their respective Facebook

---

[9] A Facebook user who posts content will receive a notification from each user who likes the post. See Olivia League, Whether You Like it or Not Your "Likes" are Out: An Analysis of Nonverbal Conduct in the Hearsay Context, 68 S.C. L. Rev. 939, 948 (2017); https://www.facebook.com/help/166890600000 6551?helpref=popular_topics.

[10] Facebook allows a user's friends to see public events that a user has selected "interested in." See https://www.facebook.com/help/151154081619755?helpref=uf_per malink.

[11] "Sharing" a Facebook post means that it will show up on your friends' News Feeds and on your profile. See https://www.facebook.com/help/333140160100643.

"News Feed."[12] As a Facebook friend, Judge Bitney could also see Carroll's posts, photographs, and other information that she provided on her profile.[13] Judge Bitney never disclosed the friendship, Carroll's reactions or comments to his posts, or Carroll's Facebook activity on his News Feed.

¶10 On July 14, 2017, Judge Bitney issued a written decision in favor of Carroll. In relevant part, he found that Carroll had shown "by the greater weight of credible evidence that Mr. Miller has engaged in a pattern of domestic abuse against . . . Carroll," which constituted a "substantial change" in the parties' circumstances since the 2011 stipulation.[14] Consequently, he granted Carroll sole legal custody and primary physical placement of Bruce, which he decided was in Bruce's best interest. Judge Bitney also approved Carroll's request to move from Rice Lake, Wisconsin to Durand, Wisconsin and ordered Miller to pay child support.

---

[12] The News Feed is a "constantly updating list of stories in the middle of [the user's] home page. News Feed includes status updates, photos, videos, links, app activity and likes from people, Pages and groups." https://www.facebook.com/help/1155510281178725.

[13] See Parker v. State, 85 A.3d 682, 685 (Del. 2014) ("[A] user will post content—which can include text, pictures, or videos—to that user's profile page delivering it to the author's subscribers.").

[14] Wisconsin Stat. § 767.451(1)(b) requires a "substantial change of circumstances since the entry of the last order affecting legal custody" in order for a court to modify a custody or physical placement order "where the modification would substantially alter the time a parent may spend with his or her child."

¶11 The same day that Judge Bitney issued his decision, the guardian ad litem (GAL) appointed to the case was alerted to a Facebook post that Carroll had authored regarding Judge Bitney's favorable ruling.[15] Carroll's post read:

> My boys and a [sic] I have been given a chance at greatness, peace, and safety.
>
> The Honorable Judge has granted everything we requested.  I'm overwhelmed with emotions and as bitter sweet as this is, we will have better from here on out.
>
> . . .
>
> I'll be bouncing off [Facebook] to focus all my attention on [Bruce] and helping him through these tough changes.

While viewing Carroll's post, the GAL inadvertently discovered that Carroll was Facebook friends with Judge Bitney.[16] The GAL indicated that she "felt a duty" to immediately alert Miller's counsel of the Facebook friendship and Carroll's recent Facebook post.

¶12 Miller filed a motion for reconsideration, alleging that his due process right to an impartial judge was violated.[17] In denying the motion, Judge Bitney confirmed his Facebook friendship with Carroll, but asserted that he had no bias and

---

[15] A GAL was appointed to the case pursuant to Wis. Stat. § 767.481(2)(c)3.

[16] A Facebook user's "friend" list appears on her profile page.  See Strunk v. State, 44 N.E.3d 1, 5 (Ind. Ct. App. 2015).

[17] Miller did not bring a claim for judicial disqualification pursuant to Wis. Stat. § 757.19, or file an ethics complaint with the Office of Lawyer Regulation.

that no "reasonable person in the circumstances of Mr. Miller or others . . . would seriously call into question the Court's objectivity or impartiality." Judge Bitney based his ruling on the fact that he "did not respond, other than to accept the Facebook friendship request . . . [and] did not like any posts, respond to any posts, or conduct any communication ex parte or otherwise with Ms. Carroll, other than simply accepting the Facebook friendship request." He further claimed that on the Monday he accepted Carroll's friend request he "had decided how [he] was going to rule, even though it hadn't been reduced to writing," despite the fact that the parties' briefs were only filed the previous Friday. Judge Bitney did not deny seeing Carroll's reactions, comments, or posts on Facebook. He admitted that the parties "presented accurately the substance of the interaction between Miss Carroll and the Court on Facebook." The record lacked any further clarification of the Facebook interactions between Carroll and Bitney.

¶13 Miller appealed the merits of Judge Bitney's decision and the denial of his motion for reconsideration. On the motion for reconsideration, the court of appeals concluded that Judge Bitney's actions "created a great risk of actual bias, resulting in the appearance of partiality." Miller v. Carroll, 2019 WI App 10, ¶2, 386 Wis. 2d 267, 925 N.W.2d 580. In reaching this conclusion, the court of appeals relied upon the timing of the Facebook friendship, the lack of disclosure of the friendship and Carroll's Facebook activity, ex parte communication concerns, and a consideration of this court's ethical rules.

9

Id., ¶¶21-27. The case was remanded for further proceedings before a different circuit court judge.

¶14 Carroll petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

¶15 "The right to an impartial judge is fundamental to our notion of due process." State v. Goodson, 2009 WI App 107, ¶8, 320 Wis. 2d 166, 771 N.W.2d 385; see also Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 876 (2009) ("It is axiomatic that '[a] fair trial in a fair tribunal is a basic requirement of due process.'" (alteration in original) (quoted source omitted)); U.S Const. amends. V, XIV; Wis. Const. art. I, § 8. Whether Judge Bitney's partiality can reasonably be questioned is a matter of law that we review de novo. Goodson, 320 Wis. 2d 166, ¶7.

¶16 We presume that a judge has acted fairly, impartially, and without bias. State v. Herrmann, 2015 WI 84, ¶24, 364 Wis. 2d 336, 867 N.W.2d 772; Goodson, 320 Wis. 2d 166, ¶8. To overcome that presumption, the burden is on the party asserting judicial bias to show bias by a preponderance of the evidence. Herrmann, 364 Wis. 2d 336, ¶24. If a party rebuts this presumption and shows a due process violation, the error is structural and not subject to a harmless error analysis. See Williams v. Pennsylvania, __ U.S. __, 136 S. Ct. 1899, 1909 (2016) ("[A]n unconstitutional failure to recuse constitutes structural error . . . .").

## III. ANALYSIS

10

¶17 We begin with background information on what a Facebook "friendship" entails. We next articulate the standard for resolving when the probability of actual bias rises to the level of a due process violation, and apply that analysis to the facts of this case.

A. Facebook "Friendships"

¶18 Facebook is a social media and social networking service with approximately 2.5 billion monthly active users. See Press Release, Facebook, Facebook Reports Fourth Quarter and Full Year 2019 Results (Jan. 29, 2020). A user creates a Facebook profile by entering the user's name, date of birth, and e-mail address, and registering a password with the site. See Smith v. State, 136 So. 3d 424, 432 (Miss. 2014). After creating a profile, a user establishes connections by sending other users a "friend" request. See Law Offices of Herssein & Herssein, P.A. v. United Servs. Auto Ass'n, 271 So. 3d 889, 895 (Fla. 2018). The "friended" user must affirmatively accept the request for the two users to become Facebook "friends." See id. "Friends" have the ability to view and interact with each other's Facebook profiles. See State v. Eleck, 23 A.3d 818, 820 n.1 (Conn. App. Ct. 2011).

¶19 When a Facebook user logs onto her Facebook page, she is automatically presented with updated activity from her Facebook "friends" on the Facebook News Feed. See Rembrandt Soc. Media, LP v. Facebook Inc., 22 F. Supp. 3d 585, 590 (E.D. Va. 2013). The News Feed is a "constantly updating list of stories from people and Pages that [the User] follow[s] on

11

Facebook." Bland v. Roberts, 730 F.3d 368, 385 (4th Cir. 2013) (alterations in original) (quoted source omitted). Through this News Feed and access to other user's pages, Facebook allows its users to "track friends' interests, affiliations, 'likes,' and general progression through life." Daniel Smith, When Everyone is the Judge's Pal: Facebook Friendship and the Appearance of Impropriety Standard, 3 Case W. Res. J.L. Tech. & Internet 66, 97 (2012). A user can interact with Facebook friends on the site, including "posting and reading comments, events, news, and, in general, communicating with . . . others." United States v. Jordan, 678 Fed. Appx. 759, 761 n.1 (10th Cir. 2017) (unpublished).

¶20 Facebook categorizes every social connection of a user as a "friend." "Some [Facebook users] may be friends in the traditional sense, but others are no more than acquaintances or contacts or in some cases may even be complete strangers." United States v. Tsarnaev, 157 F. Supp. 3d 57, 67 n.16 (D. Mass. 2016); see also Chace v. Loisel, 170 So. 3d 802, 803 (Fla. Dist. Ct. App. 2014) ("The word 'friend' on Facebook is a term of art."). But, the Facebook user "typically knows massive amounts of information about each of his Facebook friends——far more than what he knows about the average 'real-life' acquaintance." Smith, supra ¶19, at 97. The accessibility of personal information on popular social media platforms such as Facebook presents unique concerns and implications regarding the potential for judicial bias.

B.  Judicial Bias and the Due Process Clause

¶21 "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). We presume that a judge has acted fairly, impartially, and without bias. Herrmann, 364 Wis. 2d 336, ¶24. To overcome that presumption, the burden is on the party asserting judicial bias to show bias by a preponderance of the evidence. Id. In evaluating whether a party has rebutted the presumption, Wisconsin courts have taken both a subjective and objective approach. Id., ¶26. A judge must disqualify himself from a case if he subjectively determines that he is unable to remain impartial. State v. Walberg, 109 Wis. 2d 96, 105-06, 325 N.W.2d 867 (1982). Judge Bitney indicated that he believed himself to be fair and impartial, and therefore subjective bias is not at issue in this case. We focus on Miller's assertion that Judge Bitney was objectively biased due to the probability of actual bias.

¶22 The United States Supreme Court has established that a serious risk of actual bias can objectively rise to the level of a due process violation. See, e.g., Caperton, 556 U.S. 868. In Caperton, the Court reviewed its judicial bias jurisprudence and identified the previous instances where it had concluded, "as an objective matter," that recusal was required because "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Id. at 877. Applying existing principles to a new fact pattern, the Court reaffirmed that a court must assess whether "under a

13

realistic appraisal of psychological tendencies and human weakness,' the interest 'poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Id. at 883-84 (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)). The Court defined the "risk of actual bias" as a "serious risk of actual bias——based on objective and reasonable perceptions" and clarified that "[a]pplication of the constitutional standard . . . will thus be confined to rare instances." Id. at 884, 890.

¶23 Since Caperton, this court has decided one case involving judicial bias, Herrmann, 364 Wis. 2d 336. In Herrmann, the defendant claimed the circuit court's statements at sentencing reflected an objective bias. Id., ¶¶21-22. All members of the court agreed that the defendant had failed to rebut the presumption of impartiality and cited to Caperton. However, the Herrmann decision consisted of three separate writings, none of which garnered the vote of a majority of the court.

¶24 To assess whether the probability of actual bias rises to the level of a due process violation, we apply, verbatim, the standard from Caperton. We ask whether there is "a serious risk of actual bias——based on objective and reasonable perceptions." Caperton, 556 U.S. at 884. "Due process requires an objective inquiry" into whether the circumstances "would offer a possible temptation to the average . . . judge to . . . lead him not to hold the balance nice, clear and true." Id. at 885 (omissions

14

in original) (quoting Tumey v. Ohio, 273 U.S. 510, 532 (1927)). We acknowledge that it is the exceptional case with "extreme facts" which rises to the level of a "serious risk of actual bias." Id. at 886-87; id. at 876 ("[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." (quoted source omitted)).

## C. Application

¶25 We presume that Judge Bitney acted fairly, impartially, and without prejudice. See Herrmann, 364 Wis. 2d 336, ¶24. We consider the totality of the circumstances and conclude that Miller has rebutted this presumption by showing "a serious risk of actual bias." Caperton, 556 U.S. at 884.[18] These circumstances include: (1) the timing of the Facebook friend request and Judge Bitney's affirmative acceptance; (2) the volume of Carroll's Facebook activity and likelihood Judge Bitney viewed her posts and comments; (3) the content of the Facebook activity as it related to the context and nature of the pending proceeding; and (4) Judge Bitney's lack of disclosure.

¶26 We first consider the timing of the Facebook friendship: both when Carroll sent the friend request and when

---

[18] In her concurrence, Justice Ann Walsh Bradley advocates for an "appearance of bias" framework, relying on language from pre-Caperton court of appeals decisions, as well as her lead opinion in State v. Herrmann, 2015 WI 84, 364 Wis. 2d 336, 867 N.W.2d 772. Rather than use the phrase "appearance of bias," this opinion relies on the exact language used by the United States Supreme Court in Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009).

15

Judge Bitney affirmatively accepted it. Although Judge Bitney had "thousands" of Facebook friends, Carroll was not an established "friend." Instead, she was a current litigant who requested to be Judge Bitney's friend only <u>after</u> she testified at a contested evidentiary hearing in which he was the sole decision-maker. Judge Bitney had presided over the case since August of 2016; yet, Carroll friended him <u>after</u> he heard the evidence and the final briefs were submitted, but before he rendered a decision. The timing of the friend request implied that Carroll wanted to influence Judge Bitney's decision on her motion to modify legal custody, physical placement, and child support.

¶27 It is significant that Judge Bitney took the <u>affirmative</u> step of accepting Carroll's "friend request" prior to issuing a written decision on her motion. Sending a Facebook friend request does not automatically mean that the users become "friends." A user can decline a friend request or simply ignore it. See <u>Law Offices of Herssein & Herssein</u>, 271 So. 3d at 895 (noting that the "friended" user must affirmatively accept the request for the two users to become Facebook "friends"). By accepting Carroll's request, Judge Bitney accepted access to off-the-record facts that were relevant to the dispute, namely information regarding Carroll's character and parental fitness.[19]

---

[19] In an affidavit filed with the motion for reconsideration, Miller's sister asserted that Carroll made a "purposeful switch in [her] Facebook persona to support her position in the custody dispute," including changing her pictures and posts "from party type pictures and posts to family pictures and posts about children and family."

16

Acceptance of Carroll's friend request enabled Judge Bitney to view Carroll's Facebook profile and see her posts, "reactions," comments, and "shares" on his constantly refreshing News Feed. Carroll's request, and Judge Bitney's acceptance, put Carroll in a different position than Miller and caused an improper asymmetry of access.

¶28 The likelihood Judge Bitney would have seen Carroll's Facebook activity is another important factor we consider in assessing whether there was a "serious risk of actual bias." Carroll engaged with and "reacted to" a significant number of Judge Bitney's Facebook posts. Carroll "liked" at least 16 of Judge Bitney's posts, primarily related to prayers and Bible verses, "loved" two other posts, and commented on two posts regarding his knee surgery, including sending him "prayers." Judge Bitney would have received a Facebook notification for each of Carroll's reactions and comments. See League, supra ¶8 n.9, at 948 (explaining that when a Facebook user likes another user's post, "the person who posted the content will get a notification that [the] user 'liked' his or her post" (footnotes omitted)). Carroll's Facebook activity also included "liking" and "sharing" posts and articles related to domestic violence awareness, and showing she was "interested in" an event promoting domestic violence awareness.

¶29 At the reconsideration hearing, Judge Bitney never denied seeing Carroll's reactions or comments to his posts, or her "shares," reactions, or "interest in" third-party posts and events related to domestic violence awareness, despite having an

17

opportunity to do so.  Moreover, Judge Bitney was very active on Facebook during this time period, thus increasing the likelihood of him seeing Carroll's "likes," "loves," and "shares" on Facebook.[20]   The significant number of undisclosed contacts between Judge Bitney and Carroll in the 25 days before Judge Bitney rendered a decision entirely in Carroll's favor increased the likelihood of a serious risk of actual bias.

¶30 We further consider the context and nature of the pending litigation when assessing the serious risk of actual bias.  This was a custody dispute in which Judge Bitney was the sole factfinder regarding the character and parental fitness of Miller and Carroll.  His decision on the placement and custody of Bruce was necessarily driven by his personal evaluation of both parties, as their personal lives were relevant and the subject of extensive testimony from 15 witnesses.  Carroll and Miller had an opportunity at the hearing to portray themselves in the best light.  However, Carroll was provided with additional opportunities to do this for 25 days through her access to Judge Bitney via Facebook.

---

[20] The record does not provide conclusive evidence that Judge Bitney read any of Carroll's posts, but any evidence to the contrary is notably absent.  Facebook uses an algorithm to determine which posts are most relevant and engaging to each user and then presents them at the top of the user's News Feed. A user will not see posts from each and every Facebook friend, so it is not guaranteed that Judge Bitney would have seen the posts by simply scrolling through his feed.  The converse is also true; it cannot be guaranteed that Judge Bitney did not see Carroll's posts.  See generally https://buffer.com/library/faceb ook-news-feed-algorithm.

18

¶31 The Facebook activity, including 18 "reactions" and two comments, was relevant to the decision-making process in a proceeding like this one, where Carroll's character, fitness, and credibility were paramount.   Carroll was allowed the opportunity to give Judge Bitney additional information about herself and an extra "remember me" almost 25 different times during the time period when the matter was under advisement, all unbeknownst to Miller.   By reacting to and engaging with Judge Bitney's posts, Carroll was effectively signaling to Judge Bitney that they were like-minded and, for that reason, she was trustworthy.   She was conveying to him off-the-record information about her values, character, and parental fitness—additional evidence Miller did not have the opportunity to rebut.   Under a "realistic appraisal of psychological tendencies and human weaknesses," this off-the-record information about Carroll, created a serious risk of actual bias. Caperton, 556 U.S. at 883 (quoted source omitted).

¶32 It is also striking that a portion of Carroll's Facebook activity was related to her main allegation against Miller at the contested hearing:   domestic violence.   Carroll "shared" third-party posts related to domestic violence, "reacted" to articles about the effects of domestic violence,[21] and showed herself as "interested in" a domestic violence

---

[21] Had Carroll sent Judge Bitney a letter containing a domestic violence article, which he then read, he undoubtedly would have had to disclose that information to the parties. Carroll fails to distinguish that situation from the case at hand.

19

awareness event.  Allegations of domestic violence formed the basis for Carroll's motion to modify child custody and placement, and a finding of domestic violence formed the basis for Judge Bitney's decision.  Carroll's Facebook activity supported her allegation that Miller had committed domestic violence against her and that she should therefore be awarded custody.  But unlike the information presented at the hearing, Miller was unaware that Judge Bitney had access to this off-the-record information.

¶33 Finally, we consider Judge Bitney's lack of disclosure, at any point, in any way or form, as an important factor in assessing the serious risk of actual bias.  Youkers v. State, 400 S.W.3d 200 (Tex. App. 2013), provides guidance as to how a judge should respond to communications from a social media connection.  In Youkers, a Texas court of appeals considered a judicial bias claim based on a trial judge's designation as a Facebook friend of the victim's father.  Id. at 204-07.  The victim's father had sent the judge a private message on Facebook asking for leniency for the defendant.  Id. at 204.  The judge responded to the message, advising the father that the message was in violation of rules precluding ex parte communications, stating that he stopped reading the message once he realized the message was improper, and warning that any further messages about the case would result in the two no longer being Facebook friends.  Id.  The judge also advised the father that he was placing the communication in the court's file, disclosing the message to the lawyers on the case, and contacting the judicial

20

conduct commission to determine if further steps were required. Id.

¶34 Unlike in Youkers, where the judge took affirmative steps following the communications, Judge Bitney failed to disclose the friendship and the subsequent communications.[22] Judge Bitney could have initially ignored or denied Carroll's friend request and disclosed the request to the parties.  He could have also disclosed the Facebook friendship when he received notification of Carroll's reactions to his posts, unfriended Carroll on Facebook, or changed his security settings to hide her posts from appearing on his News Feed.[23]  Instead, Judge Bitney failed to disclose the friendship or other Facebook activity, and the friendship was discovered only after Judge

---

[22] Judges should be cautious when using social media and appreciate the risk of ex parte communications being sent through social media sites.  According to Black's Law Dictionary, an "ex parte communication" is a "communication between counsel or a party and the court when opposing counsel or party is not present." Ex parte communication, Black's Law Dictionary 337 (10th ed. 2014).  The court of appeals concluded that "[t]he Facebook connection between Carroll and Judge Bitney involved ex parte communications" because Carroll sent, and Judge Bitney accepted, the Facebook friend request without Miller's knowledge. Miller, 386 Wis. 2d 267, ¶24.  Further, the court noted that "ex parte communication occurred to the extent Judge Bitney and Carroll viewed each other's Facebook posts." Id.  Although we do not explicitly focus on "ex parte communication concerns" as one of the factors in our analysis, see id., ¶¶24-26, we do consider the undisclosed nature of the communications as an important factor in assessing the serious risk of actual bias.

[23] Facebook allows its users to control what content appears on their respective News Feed. See https://www.facebook.com/help/964154640320617/?helpref=hc_fnav

Bitney issued his decision. Because of Judge Bitney's lack of any means of disclosure, Miller was unable to review the interactions between Judge Bitney and Carroll and have an opportunity to refute what Judge Bitney might have seen Carroll post or share.

¶35 The totality of the circumstances and the extreme facts of this case, viewed objectively, rise to the level of a serious risk of actual bias, which rebuts the presumption of Judge Bitney's impartiality. The serious risk of actual bias is a structural error, which is "different from regular trial errors because they 'are structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.'" State v. Pinno, 2014 WI 74, ¶49, 356 Wis. 2d 106, 850 N.W.2d 207 (quoted source omitted). Accordingly, this matter must be reversed to proceed before a different circuit court judge since it is difficult to determine "how the error affected the trial."[24] Id.; see also Williams, 136 S. Ct. at 1909 ("The Court has little trouble concluding that a due process violation arising from the participation of an interested judge is a defect 'not amenable' to harmless-error review, regardless of whether the judge's vote was dispositive." (quoting Puckett v. United States, 556 U.S. 129, 141 (2009))); see also Pinno, 356 Wis. 2d 106, ¶50 (noting that a "biased judge" is a structural error).

---

[24] We need not reach the merits of Judge Bitney's determination as it relates to legal custody, physical placement, and child support.

22

## IV. CONCLUSION

¶36 We conclude that the extreme facts of this case rebut the presumption of judicial impartiality and establish a due process violation. Accordingly, we affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶37 ANN WALSH BRADLEY, J. *(concurring).* In a unanimous opinion, the court of appeals concluded that "the circuit court's undisclosed [electronic social media] connection with a current litigant in this case created a great risk of actual bias, resulting in the appearance of partiality. Accordingly, Miller has demonstrated the judge was objectively biased." <u>Miller v. Carroll</u>, 2019 WI App 10, ¶2, 386 Wis. 2d 267, 925 N.W.2d 580. I agree.

¶38 Although I join the majority opinion[1], I write separately because its analysis fails to discuss the role that appearance of bias can play in the due process analysis. Additionally, it neglects to inform the reader that its analysis is at odds with this court's "hands-off" approach in certain due process challenges. The following provides the rest of the story.

I

¶39 There is no need to repeat the facts, as the majority opinion has aptly set them forth. Suffice it to say that on the motion for reconsideration and relief from the prior order,[2] Miller argued that Judge Bitney's Facebook friendship with the opposing party, Carroll, gave rise to the appearance of partiality. Differentiating between subjective and objective bias, Judge Bitney opined that he was not subjectively biased and that the facts here did not support a conclusion that he was objectively biased. <u>Id.</u>, ¶11.

---

[1] I join the majority opinion with the exception of footnote 18.

[2] <u>See</u> Wis. Stat. §§ 805.17(3), 806.07.

1

¶40 The analysis in this case is best understood in light of a short preface detailing the development of the case law in this area. In determining whether a defendant's due process right to trial by an impartial and unbiased judge[3] has been violated, Wisconsin courts have examined both subjective bias and objective bias. State v. Rochelt, 165 Wis. 2d 373, 378, 477 N.W.2d 659 (Ct. App. 1991). The subjective test is based on the judge's own determination of his or her impartiality and the objective test is premised on whether a reasonable person could question the judge's impartiality. State v. Gudgeon, 2006 WI App 143, ¶¶20-21, 295 Wis. 2d 189, 720 N.W.2d 114.

¶41 Objective bias can exist in two situations: (1) where objective facts create a serious risk of actual bias; or (2) where objective facts demonstrate that a judge actually treated a party unfairly. State v. Goodson, 2009 WI App 107, ¶9, 320 Wis. 2d 166, 771 N.W.2d 385; Caperton v. A.T. Massey Coal Co., Inc., 556 U.S. 868, 884 (2009). The Gudgeon court recognized that the appearance of partiality violated due process "only where the apparent bias revealed a great risk of actual bias." Gudgeon, 295 Wis. 2d 189, ¶23.

¶42 It continued that "the appearance of bias offends constitutional due process principles whenever a reasonable person——taking into consideration human psychological tendencies and weaknesses——concludes that the average judge could not be trusted to 'hold the balance nice, clear and true' under all the

_____

[3] Although I use the term "judge," such term encompasses municipal court judges, circuit court judges, judges of the court of appeals, and justices of this court.

2

circumstances." Id., ¶24. Further, the court emphasized that the appearance of bias is to be examined "based on what a reasonable person would conclude[,] . . . not what a reasonable trial judge, a reasonable appellate judge, or even a reasonable legal practitioner would conclude." Id., ¶26. Importantly, these statements recognize that the right to an impartial decisionmaker encompasses the appearance of bias and not simply the absence of actual bias.

¶43 Less than a month after the court of appeals applied the above-cited Gudgeon framework in Goodson, 320 Wis. 2d 166, the United States Supreme Court issued its opinion in Caperton, 556 U.S. 868. The Caperton court determined that actual bias need not be shown to establish a violation of a party's right to a fair tribunal, reaffirming its previous declaration that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" In re Murchison, 349 U.S. 133, 136 (1955) (quoting Offutt v. United States, 348 U.S. 11, 14 (1954)).

¶44 The Caperton court embraced a "probability of actual bias" standard ("the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable"). Caperton, 556 U.S. at 877 (quoting Withrow v. Larkin, 421 U.S. 35, 47 (1975)). Ultimately, it set forth the essential inquiry into judicial bias, when there is no actual bias, as whether there is "a serious risk of actual bias—based on objective and reasonable perceptions . . . ." Caperton, 556 U.S. at 884 (emphasis added).

3

¶45 Indeed, the Caperton court specified that it was not addressing whether there was actual bias present:

We do not question his subjective findings of impartiality and propriety. Nor do we determine whether there was actual bias. . . .

[T]he Due Process Clause has been implemented by objective standards that do not require proof of actual bias. In defining these standards the Court has asked whether, "under a realistic appraisal of psychological tendencies and human weakness," the interest "poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented."

Caperton, 556 U.S. at 882-84 (quoting Withrow, 421 U.S. at 47). It further made clear that "[d]ue process 'may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.'" Id. at 886 (quoting Murchison, 349 U.S. at 136).

¶46 If under Caperton, something less than actual bias can be held to violate due process, then what is it?

¶47 The Caperton court relied upon basic principles from its precedent to inform the discussion. It employed terms such as "probability" and "perception" in framing a standard and inquiry. Scholars and commentators differ on what role the Murchison "appearance of bias" plays in the Caperton due process analysis. See, e.g., Comments, Caperton v. A.T. Massey Coal Co.: Due Process Limitations on the Appearance of Judicial Bias, 123 Harv. L. Rev. 73, 78-79 (2009) (collecting three disparate views).

4

¶48 Some insight can be gleaned from a review of the transcript of the oral argument in Caperton. Two of the justices in the five justice majority opinion indicated that they viewed standards set by prior cases——"appearance of bias" and "probability of bias"——as synonymous. So do I. To the mix, the Caperton opinion added the synonymous term "perception."

¶49 At oral argument, Justice Ginsburg commented that past cases used the terms "appearance [of bias]," "probability of bias," and "likelihood of bias" interchangeably. Referring to one of those past cases she stated:

> I think of Justice Marshall's decision in Peters and Kiff, involving a grand jury, and he said that due process is denied in circumstances creating the likelihood or the appearance of bias. And there are other decisions, too, that use those terms interchangeably. So I don't know that probability of bias, likelihood of bias, appearance——that——those seem to me synonyms.

Transcript of Oral Argument at 34-35, Caperton, 556 U.S. 868 (No. 08-22).[4]

¶50 In response to counsel's answer that appearance of bias was not part of the due process inquiry, Justice Stevens responded, "You don't think the community's confidence in the way judges behave is an important part of due process?" Id. at 36. Justice Kennedy subsequently interjected, "But our whole system is designed to ensure confidence in our judgments." Id. at 37.

---

[4] See Peters v. Kiff, 407 U.S. 493, 502 (1972) ("Moreover, even if there is no showing of actual bias in the tribunal, this Court has held that due process is denied by circumstances that create the likelihood or the appearance of bias.").

5

¶51 The upshot of the analysis is that when appearance of bias is part of a due process challenge, it comes with an exacting standard. A defendant may rebut the presumption of impartiality by demonstrating that the appearance of bias reveals a serious risk of actual bias. Caperton, 556 U.S. at 884-85; Goodson, 320 Wis. 2d 166, ¶14; Gudgeon, 295 Wis. 2d 189, ¶23.[5] This "appearance of bias" framework has been reliably applied in the courts of this state. See, e.g., State v. Dylan S., 2012 WI App 25, ¶30, 339 Wis. 2d 442, 813 N.W.2d 229; State v. Marcotte, 2020 WI App 28, ¶17, __ Wis. 2d __, __ N.W.2d __.

¶52 Caperton emphasizes, as does the majority here, that it is only the "exceptional case" with "extreme facts" that will rise to the level of a due process violation on account of the serious risk of actual bias. Majority op., ¶24 (citing Caperton, 556 U.S. at 876, 886-87). As the Caperton court further observed, because almost every state has a code of conduct with more rigorous recusal standards than due process requires, most recusal disputes will be resolved without resort to the Constitution, making the constitutional standard's application rare.

> "The Due Process Clause demarks only the outer boundaries of judicial disqualifications. Congress and the states, of course, remain free to impose more rigorous standards for judicial disqualification than those we find mandated here today." Because the codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution.

---

[5] See also State v. Herrmann, 2015 WI 84, ¶3, 364 Wis. 2d 336, 867 N.W.2d 772 (Ann Walsh Bradley, J., lead op.).

6

Application of the constitutional standard implicated in this case will thus be confined to rare instances.

Caperton, 556 U.S. at 889-90 (quoting Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 828 (1986)).

II

¶53 As the present case demonstrates, review is available to a litigant who advances a due process challenge when a judge decides to remain on a case after a motion for recusal. This is a subject with which this court has some familiarity. See State v. Allen, 2010 WI 10, 322 Wis. 2d 372, 778 N.W.2d 863 (per curiam); State v. Henley, 2011 WI 67, 338 Wis. 2d 610, 802 N.W.2d 175 (per curiam).

¶54 In furtherance of the "rest of the story" referenced above, I observe that the majority opinion here is at odds with Henley, 338 Wis. 2d 610. In Henley, the majority determined that when this court is faced with a motion to disqualify a single justice from a case, it is powerless to overturn that justice's determination: "determining whether to recuse is the sole responsibility of the individual justice for whom disqualification from participation is sought . . . ." Id., ¶39.

¶55 The majority in Henley made this determination without benefit of briefs or argument on the issue. Claiming a powerlessness to act, the majority in essence treated the due process claim challenging the participation of a justice as nonjusticiable. Thus, Henley's circle-the-wagons response cannot peacefully coexist with the majority's due process analysis.

7

¶56 Although, as here, a judge against whom bias is asserted may determine that no bias exists, reviewing courts, at whatever level, still have a role to play. When called upon to review an asserted due process violation for the failure to recuse, a reviewing court objectively determines whether the failure to recuse is consistent with due process principles.

¶57 Caperton announced the need for objective review of recusal challenges, regardless of the level of the court. Indeed, the Caperton court, which involved a review of the recusal decision of a justice on the West Virginia Supreme Court, declared:

> [O]bjective standards may also require recusal whether or not actual bias exists or can be proved. Due process "may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." The failure to consider objective standards requiring recusal is not consistent with the imperatives of due process.

Caperton, 556 U.S. at 886 (quoting Murchison, 349 U.S. at 136).

¶58 The majority opinion in the present case follows Caperton, and explicitly adopts the "objective inquiry" it mandates in a due process analysis addressing the failure to recuse. Majority op., ¶24. It is thus fundamentally inconsistent with the approach taken by the Henley majority. The Henley court ignored the Caperton mandate referenced above that "[t]he failure to consider objective standards requiring recusal is not consistent with the imperatives of due process." Caperton, 556 U.S. at 886.

8

¶59 When the motion for recusal is made only to the judge against whom bias is asserted, and no review is requested, then Henley gets it half right: the decision regarding recusal begins and ends with the decision of that judge. But when a court is called upon to review a recusal decision, whether by appellate review or motion to this court, such a determination is no longer solely up to the judge against whom bias is asserted.

¶60 If a constitutional due process challenge is asserted, it is up to the reviewing court to address the issue. Any language to the contrary does not pass constitutional muster as framed by Caperton and should be withdrawn. See also Polsky v. Virnich, 2011 WI 69, ¶4, 335 Wis. 2d 555, 804 N.W.2d 80 (per curiam) (opining that "this court does not have the power to remove a justice from participating in an individual proceeding, on a case-by-case basis" and that "due process is provided by the decisions of the individual justices who decide to participate in the cases presented to the court"); Wis. S. Ct. IOP III.L.1 (Sept. 12, 2019) ("The decision of a justice to recuse or disqualify himself or herself is that of the justice alone.").

¶61 It would be incongruous for the Caperton due process standard to apply to our review of a circuit court or court of appeals judge's determination to recuse, yet leave the decision to a single justice's determination when such a due process issue is presented in this court. Due process is due process. The right to a fair tribunal exists no matter the level of the

9

court. As uncomfortable as it may be, our internal operating procedure cited above does not take precedence over the United States Supreme Court's statements in Caperton.

¶62 What is at stake is nothing less than the institutional legitimacy of our courts:

> Appearances matter because the judiciary's reputation is essential to its institutional legitimacy——that is, to the public's respect for and willingness to abide by judicial decisionmaking. Indeed, scholars of the federal court system suggest that the public's perception of the judiciary's independence and integrity is the primary source of its legitimacy, and ultimately its power.

Amanda Frost, Keeping Up Appearances: A Process-Oriented Approach to Judicial Recusal, 53 U. Kan. L. Rev. 531, 532 (2005); see also Williams-Yulee v. Florida Bar, 575 U.S. 433, 445 (2015) (explaining that the United States Supreme Court has "recognized the vital state interest in safeguarding public confidence in the fairness and integrity of the nation's elected judges") (internal quotations omitted).[6]

¶63 In sum, I write separately to call attention to the critical role the appearance of bias can play in the due process analysis. I further write to address the impact of the present case on recusal practice in this court and statewide.

---

[6] See also Siefert v. Alexander, 608 F.3d 974, 985 (7th Cir. 2010) ("Due process requires both fairness and the appearance of fairness in the tribunal."); Martin H. Redish & Lawrence C. Marshall, Adjudicatory Independence and the Values of Procedural Due Process, 95 Yale L.J. 455, 484 (1986) ("Indeed, if there exists any reasonable doubt about the adjudicator's impartiality at the outset of a case, provision of the most elaborate procedural safeguards will not avail to create [the] appearance of justice.").

¶64  For the foregoing reasons, I respectfully concur.

¶65 ANNETTE KINGSLAND ZIEGLER, J.   *(concurring).*   I join the majority because it does not adopt the standard suggested in Justice Ann Walsh Bradley's concurrence.   Rather, the majority opinion is consistent with the language of the United States Supreme Court in Caperton, my writing (joined by two other justices) in Herrmann, and my writing in Allen.   See Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009); State v. Herrmann, 2015 WI 84, ¶¶112-62, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring); and State v. Allen, 2010 WI 10, ¶¶259-72, 322 Wis. 2d 372, 778 N.W.2d 863 (Ziegler, J., concurring).   Here, "the extreme facts of this case rebut the presumption of judicial impartiality and establish a due process violation." Majority op., ¶36.   I conclude, consistently with Caperton, that there is a serious risk that Judge Bitney was actually biased, in violation of the Due Process Clause.[1]

¶66   I also agree with much of Justice Hagedorn's writing (see dissent, ¶¶104-127) because recusal must not be used as a strategic weapon to judge-shop.   I write separately to again

---

[1] In her concurrence, Justice Ann Walsh Bradley advocates for a different standard from the one in the majority opinion; a different standard from the one announced in Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009).   She advocates for an appearance of bias standard.   To be clear, I join the majority opinion only because it specifically disavows that standard and adopts the precise standard set forth by the Supreme Court in Caperton——a serious risk of actual bias.   See majority op., ¶25 n.18.

Justice Ann Walsh Bradley also apparently invites future litigants to challenge our decision in State v. Henley, 2011 WI 67, 338 Wis. 2d 610, 802 N.W.2d 175.   The parties did not brief or argue that Henley is inconsistent with Caperton.   In this case, that assertion comes from Justice Ann Walsh Bradley alone.

emphasize that Caperton due process violations are rare and limited to the most extraordinary and extreme cases. But the facts presented here are indeed extraordinary. To be clear, our decision in this case is not an expansion of Caperton, but, rather, a faithful application of it to the facts of this case——which, in many ways, are even more extreme than those of Caperton itself.

¶67 I also write separately, in light of this case, to caution the Wisconsin bench about the hazards of electronic social media, and Facebook in particular. I caution judges to avoid using social media such as Facebook unless significant safeguards are in place to avoid a situation like that present here. If a judge chooses to participate in social media, then additional——not fewer——precautions must be taken. An appearance of impropriety is not itself sufficient to constitute a due process violation. But more is present here. As a result, I respectfully concur.

## I. ANALYSIS

### A. Due Process And Caperton

¶68 Whether due process requires a judge's recusal is a question of law this court reviews de novo. State v. Pinno, 2014 WI 74, ¶39, 356 Wis. 2d 106, 850 N.W.2d 207. "A fair trial in a fair tribunal is a basic requirement of due process." In re Murchison, 349 U.S. 133, 136 (1955). An impartial judge is crucial to a fair trial and, therefore, "'[d]ue process requires a neutral and detached judge.'" State v. Rochelt, 165 Wis. 2d 373, 378, 477 N.W.2d 659 (Ct. App. 1991) (quoting State

2

v. Washington, 83 Wis. 2d 808, 833, 266 N.W.2d 597 (1978)). "We presume that judges are impartial," neutral, and detached, and the burden is on the party challenging that presumption to rebut it. Pinno, 356 Wis. 2d 106, ¶103.

¶69 In Caperton, the Supreme Court concluded that a judge's failure to recuse violates due process if there is "objective proof of actual bias" or "a serious risk of actual bias." Herrmann, 364 Wis. 2d 336, ¶158 (Ziegler, J., concurring) (citing Caperton, 556 U.S. at 883-84). A mere appearance or allegation of bias alone will not rebut the presumption that a judge is impartial and will not constitute a due process violation.[2] Id., ¶160. Rather, under Caperton, the standard is whether

> a reasonable, well-informed person, knowledgeable about judicial ethical standards and the justice system and aware of the facts and circumstances the judge knows or reasonably should know, would reasonably question the judge's ability to be impartial because of actual bias or the probability of a serious risk of actual bias. Such circumstances are exceedingly rare.

Id. The Supreme Court addressed one such rare and extraordinary set of circumstances in Caperton, 556 U.S. 868.

¶70 I have previously summarized the facts of that case:

> The "extreme facts" that amounted to a due process violation in Caperton began with a $50 million jury verdict that was entered in favor of Caperton and against A.T. Massey. Caperton, 556 U.S. at 872.

---

[2] An appearance of impropriety, while perhaps disqualifying by rule (as I discuss below), is not the standard we apply in a due process analysis under Caperton, 556 U.S. 868. It is rare indeed that we would determine that a judge who has determined they can sit on a case, should not have.

3

"After the verdict but before the appeal, West Virginia held its 2004 judicial elections." Id. at 873. Five justices sit on the West Virginia Supreme Court of Appeals. Id. at 874-75. Whoever won the West Virginia Supreme Court of Appeals' 2004 election would most certainly be on the court when it decided whether to sustain or overturn this $50 million verdict against A.T. Massey. Id. at 873.

Donald Blankenship, who was A.T. Massey's chairman, chief executive officer, and president, "[knew] that the Supreme Court of Appeals of West Virginia would consider the appeal in the case." Id. Blankenship spent $3 million to support the election of Brent Benjamin, an attorney who was running against Justice Warren McGraw for a seat on the West Virginia Supreme Court of Appeals. Id. . . .

Blankenship's $3 million of expenditures supporting the election of Benjamin, who if elected would be on the West Virginia Supreme Court of Appeals when it decided the pending case involving Blankenship's company, dwarfed all other spending in the election. . . . Id. . . .

In addition, the United States Supreme Court noted that the election results were not a landslide victory. Id. A total of 716,337 people voted in the West Virginia Supreme Court of Appeals race. See id. Benjamin was elected with a narrow margin of 53.3% of the votes. Id. Benjamin defeated his opponent by fewer than 50,000 votes (Benjamin received 382,036 votes and Justice McGraw received 334,301). Id.

Approximately 11 months after Justice Benjamin won the election, and shortly before A.T. Massey filed its petition for appeal, Caperton moved to disqualify Justice Benjamin in the particular case that was pending the entire election between A.T. Massey and Caperton. Id. at 873-74. Caperton argued that the due process clause required Justice Benjamin's recusal "based on the conflict caused by Blankenship's campaign involvement." Id. at 874. Justice Benjamin denied the recusal motion. Id. The West Virginia Supreme Court of Appeals, by a 3-to-2 vote, reversed the $50 million verdict against A.T. Massey. Id. Justice Benjamin joined the majority opinion. Id.

4

"Caperton sought rehearing, and the parties moved for disqualification of three of the five justices who decided the appeal." Id. In particular, Caperton again moved to disqualify Justice Benjamin. Id. at 875. Justice Benjamin denied the motion. Id. Justice Elliot Maynard, who joined the three-justice majority opinion, granted Caperton's recusal motion because "[p]hotos had surfaced of Justice Maynard vacationing with Blankenship in the French Riviera while the case was pending." Id. at 874. Justice Larry Starcher, one of the two dissenting justices, "granted [A.T.] Massey's recusal motion, apparently based on his public criticism of Blankenship's role in the 2004 elections." Id. at 874-75. The West Virginia Supreme Court of Appeals subsequently granted rehearing. Id. at 875. Justice Benjamin, then serving as acting chief justice, selected two West Virginia circuit judges to replace the two recused justices on the case between Caperton and A.T. Massey. Id. . . . The West Virginia Supreme Court of Appeals again voted 3-to-2 to reverse the $50 million verdict against A.T. Massey. Id. at 875. Justice Benjamin again joined the majority. Id. Caperton petitioned the United States Supreme Court to review Justice Benjamin's denial of its recusal motions.

The United States Supreme Court granted certiorari to determine "whether the Due Process Clause of the Fourteenth Amendment was violated when [Justice Benjamin] denied a recusal motion." Id. at 872. The Supreme Court determined "that, in all the circumstances of [that] case, due process require[d] recusal." Id.

The United States Supreme Court concluded that there was a serious risk of Justice Benjamin's actual bias in sitting on Caperton because: (1) the case had been pending since before Justice Benjamin was elected; (2) the jury verdict in that case was $50 million; (3) if elected, Justice Benjamin would be sitting on the court that would review this $50 million verdict; (4) Blankenship's extraordinary $3 million expenditures supporting Benjamin dwarfed the amount spent by both campaign committees combined; (5) Blankenship's $3 million expenditures exceeded the expenditures of all other Benjamin supporters combined; and (6) Blankenship's $3 million expenditures had a "significant and disproportionate influence" in helping Benjamin win a close election.

5

> See Caperton, 556 U.S. at 883-86. The Supreme Court emphasized that "[t]he temporal relationship between the campaign contributions, the justice's election, and the pendency of the case [was] also critical." Id. at 886.

Herrmann, 364 Wis. 2d 336, ¶¶129-36 (Ziegler, J., concurring); see also Allen, 322 Wis. 2d 372, ¶¶263-69 (Ziegler, J., concurring). I note that the extreme facts of Caperton largely centered around Blankenship's conduct as a party to the litigation, not that of the judge.

¶71 "'[N]owhere in Caperton does the majority state that anything less than this "perfect storm," created by those extreme and extraordinary facts coupled with the timing of the election and the parties' pending case, would be sufficient to constitute a due process violation.'" Herrmann, 364 Wis. 2d 336, ¶138 (Ziegler, J., concurring) (quoting Allen, 322 Wis. 2d 372, ¶269 (Ziegler, J., concurring)).

¶72 Here, this case has nothing to do with campaign spending or a requested recusal based upon a financial interest in any respect. Rather, this case involves a judge's choice to create a Facebook account and to personally and affirmatively accept and maintain a Facebook friendship with a litigant, during a pending proceeding, giving that litigant the opportunity to communicate with the judge, and without any safeguards to ensure the integrity of the pending proceeding. In this case, the judge made the Facebook account—the judge chose to allow that exposure. The judge personally managed the account and failed to protect against litigants influencing the judge through communications on Facebook. Unsurprisingly, the

6

litigant seized upon that opportunity by trying to correspond with and influence the judge through the unprotected Facebook account created, maintained, and monitored by the judge.[3] Here, it is this objectively demonstrated attempt by a litigant to influence a judge through that judge's Facebook account during a pending proceeding that is at issue. Furthermore, while not required here, the judge decided to hold a hearing on the motion for recusal and render a decision on the record. The record supporting the motion is ample, but the decision denying the motion for recusal is exceedingly lean. See infra, ¶¶15-17.

¶73 As I explain below, we have nothing less than a "perfect storm" of "extreme and extraordinary facts" here. Herrmann, 364 Wis. 2d 336, ¶138 (Ziegler, J., concurring) (quoting Allen, 322 Wis. 2d 372, ¶269 (Ziegler, J., concurring)). The majority opinion aptly summarizes those facts, and I will assume the reader's familiarity with them. See majority op., ¶¶6-12. But I will describe some of the facts of this case separately to demonstrate that they are not only analogous to those in Caperton, but, in some aspects, even more extreme and extraordinary.

## B. Caperton And This Case

¶74 Here, a judge affirmatively created a Facebook account; instead of making it private, he made it available to the public; he accepted a party as a "friend" during pending litigation in which the judge was the sole decision-maker and

---

[3] Judges may of course wish to have a social media account for campaign purposes, but those are often monitored by a campaign and need not necessarily exist beyond the campaign.

fact-finder; and, he had no safeguards in place to avoid inappropriate communication with the party. While Judge Bitney could have done any number of things differently, he set himself up for a Caperton violation by allowing Carroll to engage in activity that indeed met the Caperton standard. Unbeknownst to the other litigant (Miller), Carroll was objectively attempting to influence Judge Bitney during pending litigation. Carroll had this opportunity because of Judge Bitney's creation of, personal management of, and activity in his Facebook account, which lacked safeguards to protect against a party's influence during pending litigation. It is the convergence of the judge's unprotected Facebook account, to which he gave asymmetric access to one party, unbeknownst to the other, to communicate with the judge on relevant issues, during pending and highly contested litigation, in which the judge was the sole decision-maker, that causes the violation in this case. The facts of this case are in many ways even more connected, direct, extreme, and extraordinary than those in Caperton, where a third party monetarily and openly supported a judge in an election believing that the judge would eventually, if elected, rule on that party's case that was proceeding through the appellate process.

¶75 In 2009, in Caperton, the Supreme Court took special note of the timing of the election and Blankenship's support of Justice Benjamin, knowing that, if he won the election, he would be a judge on A.T. Massey's case on appeal. See Caperton, 556 U.S. at 873 (noting, "[a]fter the verdict but before the appeal, West Virginia held its 2004 judicial elections. Knowing the

8

Supreme Court of Appeals of West Virginia would consider the appeal in the case, Blankenship decided to support an attorney who sought to replace Justice McGraw") (emphasis added). The Supreme Court stated, "The temporal relationship between the campaign contributions, the justice's election, and the pendency of the case is . . . critical. It was reasonably foreseeable, when the campaign contributions were made, that the pending case would be before the newly elected justice." Id. at 886. Hence, the fact that there was a pending case that would be before the judge was of great significance.

¶76 In this case, Carroll's friendship request, Judge Bitney's personal and affirmative acceptance of it, and the many Facebook activities thereafter occurred during the pendency of this litigation before Judge Bitney. In the 25 days between Judge Bitney's acceptance of Carroll's Facebook friendship and his final decision, Carroll reacted to or commented on Judge Bitney's Facebook posts at least 20 times. Those interactions included information relevant to the issues to be decided— Carroll's credibility, character, and parental fitness. In that same 25-day period, Carroll also posted on her Facebook account about domestic violence, showed that she was "interested in" attending a domestic violence-related event, and reacted to or shared other third-party content related to domestic violence, an issue which was highly relevant to the custody dispute. Even worse, all this occurred after a highly contested hearing, but before Judge Bitney issued his final decision. Carroll requested, and Judge Bitney personally and affirmatively

9

accepted, ex parte access to him <u>during</u> the drafting of his decision. Carroll offered, and Judge Bitney personally and affirmatively accepted, access to off-record facts relevant to the litigation <u>during</u> the time when he was deciding whether she was the more fit parent.

¶77 Here, the timing of the conduct is even more direct than in <u>Caperton</u>. In <u>Caperton</u>, there was a "temporal relationship" between the court's decision and the campaign support because Blankenship's campaign support occurred before the case came to the West Virginia Supreme Court of Appeals. 556 U.S. at 886. Here, unlike <u>Caperton</u>, the Facebook friendship and the judge's decision were not just temporally related. They occurred at the same time. The commencement of the friendship and the many Facebook communications occurred during the decision-making phase of the proceedings where the judge, not a jury, was the sole decision-maker. In <u>Caperton</u>, the Supreme Court concluded that at the time of Blankenship's campaign support, it was "reasonably foreseeable" that Justice Benjamin would hear the case if he won the election. <u>Id.</u> Here, Judge Bitney was currently presiding over the case; he had yet to render his decision in a pending, highly contested case. The Facebook communications were directly related to Carroll's credibility as a witness and fitness as a parent. Moreover, the content of the Facebook communications was objectively poised to evidence to the judge that one party, Carroll, had the same values and beliefs as the judge and was, therefore, the better parent. Thus, the timing of the conduct in this case is even

10

more extraordinary than in Caperton, as it was not just a probability, but a certainty, that Judge Bitney would hear Carroll's case; indeed, he was currently presiding over and deciding it. Carroll and Judge Bitney became Facebook friends and Carroll communicated with Judge Bitney on Facebook during the exact same time period when he was deciding her highly contested child custody case.

¶78 In Caperton, the parties and the public at large were all well aware of Blankenship's attempt to influence the election. Unlike here, where Miller knew nothing of Carroll's actions, Caperton knew all along that A.T. Massey and Blankenship were attempting to influence the outcome of the appeal by supporting Justice Benjamin's candidacy. See Caperton, 556 U.S. at 873-74 (stating, "[B]efore [A.T.] Massey filed its petition for appeal in West Virginia's highest court, Caperton moved to disqualify now-Justice Benjamin . . . based on the conflict caused by Blankenship's campaign involvement"). Blankenship's campaign support was public knowledge. But in this case, Judge Bitney gave Carroll an opportunity to communicate with him and try to influence him through their Facebook friendship while the other party, Miller, had no knowledge at all. The fact that Judge Bitney allowed Carroll to be in a position to objectively influence him, and she seized that opportunity, unbeknownst to Miller until after Judge Bitney issued his decision, is a fact even more extraordinary than Caperton.

11

¶79 Furthermore, in Caperton, there was a full record of the controversy and Justice Benjamin thoroughly considered and analyzed his ability to remain impartial. The Supreme Court noted, "Justice Benjamin was careful to address the recusal motions and explain his reasons why, on his view of the controlling standard, disqualification was not in order. In four separate opinions issued during the course of the appeal, he explained why no actual bias had been established." Caperton, 556 U.S. at 882. "In other words, based on the facts presented by Caperton, Justice Benjamin conducted a probing search into his actual motives and inclinations" and made a thorough record. Id. In this case, the same cannot be said of Judge Bitney. Here, the record is lean at best. While there is objective evidence of communication from one party to the judge over and over at the same time the judge was deciding the case, there is hardly anything in the record to refute it or demonstrate that the contact was of no moment.

¶80 Judge Bitney did rule on Miller's motion for recusal, but the ruling is exceedingly lean in light of what appears to be ex parte communication. Judge Bitney could have denied seeing Carroll's various reactions to and comments on his Facebook posts. But he did not. Nor did he deny seeing Carroll's Facebook posts relating to domestic violence. Nor did he deny viewing her Facebook profile. He could have explained the safeguards he has in place. He could have explained how he manages his Facebook account. But he did not. Rather, Judge Bitney admitted that the parties "presented accurately the

12

substance of the interaction between Miss Carroll and the Court on Facebook" and that, on the day he and Carroll became Facebook friends, his decision had not yet been "reduced to writing." Judge Bitney's statement that the evidence presented in the motion was an accurate reflection of his "interaction" with Carroll is consistent with the remainder of the record, which is void of any denial that he saw Carroll's comments, posts, or reactions on Facebook.[4]   This record is far from adequate to overcome the objective evidence that one party was communicating with the judge on a Facebook account developed and maintained by the judge during the pendency of a case where the judge, not a jury, is the decision-maker.

¶81  It is worth noting that, in a case tried before a jury, if the court had any question regarding improper communication between a party and a member of the jury, we would expect a full record to be made.  While judges need not detail all that goes into their decision-making as to whether to stay on a case, when a challenge is made as was made here, it is somewhat akin to that of a party or witness attempting to unduly influence a juror in a pending case.  Yet, even though this judge chose to hold a hearing and render a decision on the record, we are left with an ample record of evidence in support

---

[4] An "interaction" is defined as a "mutual or reciprocal action or influence"; it is inherently interpersonal. "Interaction." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/interaction. Accessed 4 Jun. 2020.

13

of the motion for recusal and little else. This case is indeed extraordinary.

¶82 In Caperton, the Supreme Court stated:

We conclude that there is a serious risk of actual bias——based on objective and reasonable perceptions—— when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.

Caperton, 556 U.S. at 884. In this case, Carroll was "a person with a personal stake" in the proceedings. Id. Indeed, she had the ultimate stake in the case as a mother seeking custody of her child. Carroll also had the opportunity to "significant[ly] and disproportionate[ly] influence" the case. Id. She had a Facebook friendship with Judge Bitney in which she could introduce off-record facts relevant to Judge Bitney's decision, facts which Miller had no opportunity to rebut. And all this occurred "when the case was pending" and Judge Bitney's decision was "imminent." Id. In Caperton, it was not the judge's actions, but the party's actions and their "significant and disproportionate influence" on the case that caused the Caperton violation. Id. Similarly, while Judge Bitney could have, and should have, more prudently managed his Facebook account, it is Carroll's conduct during the pendency of the litigation that is of particular concern.

¶83 Finally, in Caperton, the extraordinary conduct was attributed only to Blankenship; Blankenship paid the $3 million in support of Justice Benjamin during his campaign. Justice Benjamin concluded that no one could "point to any actual

14

conduct or activity on [his] part which could be termed 'improper.'" Caperton, 556 U.S. at 882 (quoting Caperton v. A.T. Massey Coal Co., 679 S.E.2d 223, 293 (W. Va. 2008)). The Supreme Court agreed that Justice Benjamin's conduct was not "improper." See id. ("We do not question [Justice Benjamin's] subjective findings of impartiality and propriety."). Here, the facts are different. It was the judge who established and personally managed his Facebook account, allowed public access (even personally accepting a friendship with a litigant in a pending case wherein the judge was the sole decision-maker), and had no protection in place against attempted influence.

¶84 I note that even those who would find no Caperton violation in this case agree that Judge Bitney's management of his Facebook account evidenced significant shortfalls with the lack of protections afforded. See dissent, ¶124 ("Every member of this court would agree that Judge Bitney should have been more careful."). Indeed, we can easily "point to . . . actual conduct or activity on [Judge Bitney's] part which could be termed 'improper.'" Caperton, 556 U.S. at 882 (quoting Caperton, 679 S.E.2d at 293). Put simply, Carroll would not have had ex parte access to Judge Bitney if he had not given it to her. Judge Bitney affirmatively chose to let Carroll, a party to a highly contested child custody hearing over which he presided, become his Facebook friend. Judge Bitney personally and affirmatively accepted her friendship request. Even worse, since Carroll's personal life, character, and parental fitness were relevant to the custody dispute, Judge Bitney affirmatively

15

accepted access to off-record and relevant facts about Carroll when he accepted her friend request. Judge Bitney did not disclose his Facebook friendship with Carroll. He did not disclose any of their Facebook interactions. Judge Bitney's conduct in allowing a party such access in this case was not just improper. It was extraordinary.

¶85 There is a serious risk that Judge Bitney was actually biased, in violation of the Due Process Clause. Here, as in Caperton, the violation occurs in part because of the party's actions, and in part because of the judge's actions. Certainly, Judge Bitney set up Carroll's ex parte access by choosing to be on social media and not having sufficient safeguards in place. But Caperton and this case both flow from the party's actions attempting to influence a judge or court during pending and existing proceedings——here, while the highly contested case was actually pending before Judge Bitney, the sole decision-maker.

¶86 The extreme facts of this case are as follows: (1) Judge Bitney personally managed his Facebook account; (2) Judge Bitney was the decision-maker and fact-finder in a pending custody dispute; (3) the custody dispute was highly contested and included the testimony of 15 witnesses; (4) the guardian ad litem's recommendation was contrary to the judge's decision; (5) Carroll requested a Facebook friendship with Judge Bitney immediately after final briefs in the case were submitted; (6) Judge Bitney personally and affirmatively accepted that friendship request; (7) in the 25 days between accepting the Facebook friendship and Judge Bitney's final decision, Carroll

16

reacted to or commented on Judge Bitney's Facebook posts at least 20 times; (8) those interactions included information relevant to the issues to be decided——Carroll's character and parental fitness; (9) in that same 25-day period, Carroll also posted on her account about domestic violence, showed that she was "interested in" attending a domestic violence-related event, and reacted to or shared other third-party content related to domestic violence, an issue which was highly relevant to the custody dispute; (10) Judge Bitney did not unfriend Carroll, disclose the Facebook friendship, or disclose the interactions; (11) Judge Bitney did not deny seeing any of Carroll's Facebook posts, comments, or reactions, or her profile page; and (12) Judge Bitney's decision was grounded in a conclusion that Miller had engaged in domestic violence against Carroll, was overwhelmingly in favor of Carroll, and uprooted the pre-existing physical placement of the child.[5]

¶87 Under Caperton, this perfect storm of extreme and extraordinary facts, viewed objectively, undoubtedly demonstrates a serious risk of actual bias.

## C.  Judges And Facebook

¶88 The Preamble to the Wisconsin Supreme Court Rules setting forth the Code of Judicial Conduct ("the Code") states:

> Our legal system is based on the principle that an independent, fair and competent judiciary will

---

[5] In his dissent, Justice Hagedorn describes the facts of this case as "ordinary." See dissent, ¶¶104, 106, 114, 117, 125, 126. I most certainly hope they are not. Indeed, this concurrence demonstrates why the facts of this case are not (and should not be) ordinary.

interpret and apply the laws that govern us. The role
of the judiciary is central to American concepts of
justice and the rule of law. Intrinsic to all
provisions of this Code are the precepts that judges,
individually and collectively, must respect and honor
the judicial office as a public trust and strive to
enhance and maintain confidence in our legal system.
The judge is an arbiter of facts and law for the
resolution of disputes and a highly visible symbol of
government under rule of law.

SCR ch. 60 Preamble. The Code then sets forth a series of
ethical rules that judges must follow. A judgeship carries with
it profound responsibilities to the people, the bench, the bar,
and to justice.

¶89 First, let me make clear that a violation of the Code
does not automatically constitute a violation of due process.
Whereas due process violations address serious risks of actual
bias, the Code addresses the appearance of bias even if there is
no actual bias. See Herrmann, 364 Wis. 2d 366, ¶151 (Ziegler,
J., concurring) ("'Where only the appearance of bias is at
issue, a litigant's recourse is to seek disqualification under
state disqualification statutes[.]") (quoting People v. Freeman,
222 P.3d 177, 178 (Cal. 2010); see id. ("'Less extreme cases——
including those that involve the mere appearance, but not the
probability, of bias——should be resolved under more expansive
disqualification statutes and codes of judicial conduct.'")
(quoting Freeman, 222 P.3d at 185 (citing Caperton, 556 U.S. at
889-90)). In this case, Miller brought a claim grounded in the
Due Process Clause, not the Code. Accordingly, we do not
analyze whether Judge Bitney's conduct constituted a violation
of the Code. However, social media, while something judges are
permitted to use as citizens and community members, should be

18

used with caution. Indeed, judges must always be mindful of how their actions as private citizens can impact their ability to preside over certain cases.

¶90 By way of example, under SCR 60.05(3)(c)2.d., a judge may not ask lawyers or those likely to appear before the judge to buy tickets to a pancake breakfast for a local neighborhood center. Comment, SCR 60.05(3)(c)2.d. "[A] judge may pass the collection basket during services at church, may ask friends and neighbors to buy tickets to a pancake breakfast for a local neighborhood center and may cook the pancakes at the event but may not personally ask attorneys and others who are likely to appear before the judge to buy tickets to it." Id. A judge is supposed to take precautions with in-person interactions with those who appear in front of the judge. Should that not be equally applicable for judges on social media?

¶91 Judicial use of Facebook has spawned vigorous debate regarding whether and to what extent judges ought to use Facebook, and the ethical issues Facebook poses for judges. See, e.g., Hon. Richard L. Gabriel & Nina Varsava, Friending, Following, and Liking Social Media and the Courts, Colo. Law., July 2019, at 9; Hon. M. Sue Kurita, Electronic Social Media: Friend or Foe for Judges, 7 St. Mary's J. Legal Malpractice & Ethics 184 (2017); Shaziah Singh, Friend Request Denied: Judicial Ethics & Social Media, 7 Case W. Reserve J.L. Tech. & Internet 153 (2016); John G. Browning, Why Can't We Be Friends? Judges' Use of Social Media, 68 U. Miami L. Rev. 487 (2014); Hon. Craig Estlinbaum, Social Networking & Judicial Ethics, 2

19

St. Mary's J. Legal Malpractice & Ethics 2 (2012); Samuel Vincent Jones, Judges, Friends, and Facebook: The Ethics of Prohibition, 24 Geo. J. Legal Ethics 281 (2011).

¶92 This debate continues, and various jurisdictions have taken different approaches to the intersection between judicial use of social media and ethical rules. Singh, supra ¶91, at 158-71 (summarizing approaches and stating that: Florida, Oklahoma, and Massachusetts take a "strict approach"; California, Arizona, Utah, Texas, North Carolina, and Florida take a "moderate approach"; and Maryland, New York, Kentucky, Ohio, South Carolina, Georgia, Tennessee, and the American Bar Association take a "liberal approach").

¶93 Judge Bitney was not the first judge to have chosen to use electronic social media. Indeed, there have been many troubling cases involving judicial use of electronic social media in recent years. See Browning, supra ¶91, at 497-502 (collecting cases), describing, for example:

- In re Dempsey, 29 So. 3d 1030 (Fla. 2010), in which a judge's conduct violated a canon of judicial conduct when her campaign video on YouTube misrepresented her qualifications; and

- Doe v. Sex Offender Registry Bd., 959 N.E.2d 990 (Mass. App. Ct. 2012), in which a hearing officer posted "inappropriate" comments on Facebook relating to Doe's appeal of his classification as a sex offender.

See also Kurita, supra ¶91, at 211-33 (collecting cases), describing, for example:

- Kiniti-Wairimu v. Holder, 312 F. App'x 907 (9th Cir. 2009), in which an immigration judge independently researched a Kenyan citizen's family online when his application for withholding of removal and protection under the Convention Against Torture was pending, violating due process; and

- State v. Thomas, 376 P.3d 184 (N.M. 2016), in which a judge posted twice on his campaign Facebook account regarding a trial in his courtroom, including a post saying, "In the trial I presided over, the jury returned guilty verdicts for first-degree murder and kidnapping just after lunch. Justice was served. Thank you for your prayers." Id. at 189.

¶94 I note that this case, and many others, involve use of electronic social media by a third party, not just the judge. A judge who uses electronic social media subjects himself or herself to the risk of misuse of a social media relationship by a third party. I am concerned that no matter how cautious and attentive the judge may be, a judge who uses electronic social media may expose both the judge and the judiciary as a whole to an appearance of bias or impropriety.

¶95 Accordingly, I strongly urge my colleagues on the bench to weigh the advantages and disadvantages of using electronic social media like Facebook. See Jones, supra ¶91, at 302 (concluding that, "[t]o avoid the perils that emanate from

21

current and future [electronic social networking] capacities——including, but not limited to, 'friending'——the Judicial Code should be viewed as a restrictive juridical construct").  And if a judge chooses to use a social media platform like Facebook, then that judge must proceed with the utmost diligence and caution.  See Gabriel & Varsava, supra ¶91, at 12 (concluding that "judges who wish to participate in social media should proceed with caution, asking themselves before acting whether their social media activities could be deemed by a reasonable person to undermine the judges' independence, integrity, or impartiality; place the judiciary in disrepute; or interfere with their ability to carry out the substantial duties that have been entrusted to them").

## II.  CONCLUSION

¶96  I join the majority because it does not adopt the standard suggested in Justice Ann Walsh Bradley's concurrence. Rather, the majority opinion is consistent with the language of the United States Supreme Court in Caperton, my writing (joined by two other justices) in Herrmann, and my writing in Allen. See Caperton, 556 U.S. 868; Herrmann, 364 Wis. 2d 336, ¶¶112-62 (Ziegler, J., concurring); and Allen, 322 Wis. 2d 372, ¶¶259-72 (Ziegler, J., concurring).  Here, "the extreme facts of this case rebut the presumption of judicial impartiality and establish a due process violation."  Majority op., ¶36.  I conclude, consistently with Caperton, that there is a serious risk that Judge Bitney was actually biased, in violation of the Due Process Clause.

22

¶97 I also agree with much of Justice Hagedorn's writing (see dissent, ¶¶104-127) because recusal must not be used as a strategic weapon to judge-shop. I write separately to again emphasize that Caperton due process violations are rare and limited to the most extraordinary and extreme cases. But the facts presented here are indeed extraordinary. To be clear, our decision in this case is not an expansion of Caperton, but, rather, a faithful application of it to the facts of this case——which, in many ways, are even more extreme than those of Caperton itself.

¶98 I also write separately, in light of this case, to caution the Wisconsin bench about the hazards of electronic social media, and Facebook in particular. I caution judges to avoid using social media such as Facebook unless significant safeguards are in place to avoid a situation like that present here. If a judge chooses to participate in social media, then additional——not fewer——precautions must be taken. An appearance of impropriety is not itself sufficient to constitute a due process violation. But more is present here.

¶99 For the foregoing reasons, I respectfully concur.

23

¶100 REBECCA FRANK DALLET, J. *(concurring).* I write separately to provide additional guidance and clarification for the bench and bar. There is nothing inherently inappropriate about a judge's use of social media platforms like Facebook. There is no rule or judicial ethics opinion in Wisconsin prohibiting or limiting a judge's use of social media. In fact, the use of social media platforms "can benefit judges in both their personal and professional lives." ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 13-462 at 4 (2013). Participation in social media is one way for judges to remain active in the community and "can prevent [judges] from being thought of as isolated or out of touch." Id. at 1. Additionally, Facebook and other social media platforms have become important campaign tools for judges to deliver campaign messages to the voters in Wisconsin. See Susan Criss, Use of Social Media by Judges, The, 60 Advocate (Texas) 18 ("Few judicial campaigns can realistically afford to refrain from using social media to deliver their message to the voting public.").

¶101 A judge's Facebook connection to a party or an attorney, without more, does not rebut the presumption of impartiality. Requiring automatic disqualification in every case involving a Facebook acquaintance would not reflect the true nature of a Facebook friendship and "casts a large net in an effort to catch a minnow." Chace v. Loisel, 170 So. 3d 802, 804 (Fla. Dist. Ct. App. 2014); see also Law Offices of Herssein & Herssein, P.A. v. United Servs. Auto Ass'n, 271 So. 3d 889,

1

897 (Fla. 2018)) ("No reasonably prudent person would fear that she could not receive a fair and impartial trial based solely on the fact that a judge and an attorney appearing before the judge are Facebook 'friends' with a relationship of an indeterminate nature."); ABA Formal Op. 13-462 at 2-3 ("Simple designation as an [electronic social media] connection does not, in and of itself, indicate the degree or intensity of a judge's relationship with a person."). If a mere acquaintance on Facebook required judicial recusal, it would promote gamesmanship among parties and weaponize social media.

¶102 However, judges must be cautious in their use of social media. As the American Bar Association (ABA) has reasoned, "[a] judge may participate in electronic social networking, but as with all social relationships and contacts, a judge must . . . avoid any conduct that would undermine the judge's independence, integrity, or impartiality . . . ." ABA Formal Op. 13-462 at 1. Public confidence in the administration of justice demands that members of the judiciary perform their duties impartially and free from any sort of bias. See ABA Comm'n on Ethics & Prof'l Responsibility, Formal Op. 19-488 at 2 (2019); see also Williams-Yulee v. Florida Bar, 575 U.S. 433, 445 (2015)(reaffirming the "'vital state interest' in safeguarding 'public confidence in the fairness and integrity in the nation's elected judges'" (quoted source omitted)). A judge's online "friendships," just like a judge's real life friendships, must be approached with care and caution.

2

¶103 I am authorized to state that Justice BRIAN HAGEDORN joins this concurrence.

¶104 BRIAN HAGEDORN, J. *(dissenting).* For most of American history, the United States Constitution was understood to say close to nothing about judicial recusal. This area of law, with a few extremely narrow exceptions, was left to state regulation and oversight. But as it has in many areas, the judiciary began to expand the constitutional footprint, inch by inch, and lately, step by step. Today's decision continues the march away from the original public meaning of our Constitution, and greatly risks merging ordinary judicial recusal questions with the narrow proscriptions of the Due Process Clause.

¶105 The question in this case is not whether, under an objective standard, Judge Bitney would be able to hold the balance nice, clear, and true in light of the circumstances. The question is likewise not whether Judge Bitney may have transgressed the recusal standards in the Wisconsin Statutes or Code of Judicial Conduct. Rather, the question presented is whether the record in this case demonstrates that the Fourteenth Amendment's Due Process Clause required Judge Bitney's recusal, and therefore whether Miller's due process right to an impartial tribunal was violated. Under the governing United States Supreme Court precedent, recusal is constitutionally required only when actual bias is present or when the facts of a case are so extreme as to constitute a serious risk of actual bias.

¶106 Miller claims this constitutes one of the rare cases where the risk of actual bias is constitutionally intolerable. I disagree. This is a relatively normal appearance of bias case. Granted, given its intersection with modern social media,

1

an area comparatively unexplored in judicial ethics circles, this fact pattern carries with it a sense of novelty. But outside of its medium, the facts before us are rather ordinary in the types of risks and potential conflicts at issue. I conclude the circumstances here are not so extreme as to violate Miller's due process right to an impartial tribunal. I respectfully dissent.[1]

I. THE CONSTITUTION AND RECUSAL

¶107 The Due Process Clause of the Fourteenth Amendment prohibits states from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The touchstone for a claim based on this constitutional protection is the "settled usages and modes of proceeding existing in the common and statute law of England." Tumey v. Ohio, 273 U.S. 510, 523 (1927); see also Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 277 (1856); Honda Motor Co. v. Oberg, 512 U.S. 415, 430 (1994).

¶108 Under the common law, the grounds for judicial disqualification were simple and narrow: a man could not act as the judge in his own case. See generally Williams v.

---

[1] I also join Justice Dallet's concurrence regarding judicial use of social media. Judges must be careful, but we are elected officials and members of civil society. Social media can be an important platform to inform citizens of who judges are as people, to educate the citizenry regarding the judicial role, and to promote candidacy for public office. The dangers are not significantly greater than those attendant to judicial involvement in non-profit work, participation in community-wide justice initiatives, and shaking hands at the town Fourth of July parade.

2

Pennsylvania, 136 S. Ct. 1899, 1917 (2016) (Thomas, J., dissenting). In practice, this prohibition was limited to cases where the judge had a direct and personal financial stake in the outcome, or where the judge was a party in the action. Id. Neither personal bias nor an appearance of bias was enough. Personal interest, not potential bias, was the only concern sufficient to trigger judicial disqualification. Id. One scholar summarized it this way: "English common law practice at the time of the establishment of the American court system was simple in the extreme. Judges disqualified for financial interest. No other disqualifications were permitted, and bias, today the most controversial ground for disqualification, was rejected entirely." John P. Frank, Disqualification of Judges, 56 Yale L.J. 605, 611-12 (1947).

¶109 Early American federal and state laws expanded the narrow common law rule in limited ways, notably to instances where the judge previously served as an attorney in the same case. Williams, 136 S. Ct. at 1918-19 (Thomas, J., dissenting). But the narrowness of this limitation cannot be overstated. By way of illustration, one of the most famous cases in American legal history, Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803), was presided over by Chief Justice John Marshall. But it was then-Secretary of State John Marshall who failed to deliver the commissions that led to the mandamus action before the high

3

court in the first place.[2] See Williams, 136 S. Ct. at 1919 (Thomas, J., dissenting). None of that violated the common law or constitutional rules for judicial disqualification as understood at the time.

¶110 The United States Supreme Court has recognized a constitutionally protected due process right to an impartial tribunal. See In re Murchison, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). But it has also been crystal clear that the "Due Process Clause demarks only the outer boundaries of judicial disqualifications." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 828 (1986). The vast majority of judicial disqualification issues are matters for state law and policy, not the Constitution. Tumey, 273 U.S. at 523.

¶111 Until recently, the Supreme Court's due process precedent was consonant with the narrow common law rule. Cases in the 20th century made clear that due process disqualified judges when they had "a direct, personal, substantial pecuniary interest" in the outcome of a case. See id. (explaining recusal required of a judge who would profit from a case only upon a conviction of the defendant); see also Aetna Life Ins., 475 U.S. at 823-24 (explaining recusal required of a judge whose

---

[2] In fact, Secretary Marshall tasked his younger brother, James Markham Marshall, to deliver the commissions——including the commission intended for Marbury. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 146 (1803) (referring to James Marshall's affidavit); see also Michael W. McConnell, The Story of Marbury v. Madison: Making Defeat Look Like Victory, in Constitutional Law Stories 17-18 (Michael C. Dorf ed., 2d ed. 2009) (discussing the circumstances that gave rise to Marbury).

4

decision in a case would have a "clear and immediate effect of enhancing both the legal status and the settlement value of" the judge's own cases against the same defendant). Around the middle of the 20th century, the Supreme Court also found that due process is violated by a "judge who was at the same time the complainant, indicter and prosecutor." Murchison, 349 U.S. at 135. Thus, for most of its history, the Supreme Court applied due process only to variants of the common law rules——where a judge had a direct, personal, substantial pecuniary interest, and where a judge served as counsel in the case below. These standards were based on the notion of a direct conflict and personal interest, what might be labeled actual bias. Moreover, because the constitutional proscriptions remained narrow, states had considerable room to enact stricter recusal rules based on policy and prudence, not constitutional command.

¶112 In 2009, the Supreme Court entertained a case with extreme facts, and responded with a limited expansion of the protections afforded by the Constitution. Caperton v. A.T. Massey Coal Co., 556 U.S. 868 (2009). In Caperton, West Virginia Supreme Court Justice Brent Benjamin declined to recuse on a case reviewing a $50 million verdict. Id. at 873-74. During the three years between entry of that verdict and the appeal to Justice Benjamin's court, one of the parties in the case spent $3 million to help elect Justice Benjamin to his position. Id. at 872-73. Those expenditures, which were more than all other supporters combined, had a "significant and disproportionate influence" in helping elect Justice Benjamin in

5

a close race.  Id. at 873, 884.  This was, as it were, a perfect
storm of facts——extraordinarily disproportionate campaign
contributions in a close election from a party in a pending
case.

¶113 Facing this, the Court indicated for the first time
that something less than actual bias may be of constitutional
import.  But its application was limited to cases where, under
an objective inquiry, "a serious risk of actual bias" is
present.  Id. at 884-86.  "Serious risk" does not mean simply a
meaningful risk, but one far outside the norm, one right next to
the line of actual bias.  The Court went out of its way to
stress this was no ordinary situation, stating for example:

- "On these extreme facts the probability of actual
  bias rises to an unconstitutional level."

- "[T]his is an exceptional case."

- "The facts now before us are extreme by any
  measure.  The parties point to no other instance
  involving judicial campaign contributions that
  presents a potential for bias comparable to the
  circumstances in this case."

- "Our decision today addresses an extraordinary
  situation where the Constitution requires
  recusal."

Id. at 884, 886-87.  The unmistakable message was that
"[a]pplication of the constitutional standard implicated in this
case will thus be confined to rare instances."  Id. at 890.
Under Caperton, appearance of bias is not enough to trigger a
constitutional problem.  Rather, recusal is required under the
Constitution only in the extreme, exceptional, and extraordinary
case where the risk of actual bias is so unusually high that it

6

cannot be tolerated. Id. at 877 (recusal required where "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable" (quoted source omitted)).

## II. APPLICATION

¶114 Two problems plague the majority's analysis. First, most of the court's opinion reads like an ordinary discussion on recusal, but Caperton limits application of the Due Process Clause to extreme situations. Second, the majority functionally finds facts by embracing every negative inference from a record that is, at best, ambiguous.

¶115 When the Supreme Court decided Caperton, Chief Justice Roberts warned in dissent that some might use this open door to turn routine judicial recusal questions into due process claims. Id. at 899-900 (Roberts, C.J., dissenting). The Chief Justice stressed——with no disagreement from the majority——that recusal is generally not an issue of constitutional concern. Id. at 892-93. The Supreme Court had previously said that "[m]atters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion." Id. at 892 (quoting Tumey, 273 U.S. at 523). And given this, the Chief Justice reasoned, so too are common recusal issues like "friendship with a party or lawyer, prior employment experience, membership in clubs or associations, prior speeches and writings, religious affiliation, and countless other considerations." Id. at 892.

7

¶116 It is true that <u>Caperton</u> opened the door to constitutional claims alleging something less than actual bias. But the opening was more crevice than canyon. It is easy to recite the standard that any constitutional claim based on a serious risk of bias must be an "extreme case," but that cannot operate as a license to neglect its import. That is what the majority does here. It recites <u>Caperton</u>'s repeated admonition that only extreme cases implicate the Constitution. Yet, its analysis would look almost no different if this were a case based on the recusal standards in our statutes or judicial ethics rules.

¶117 The record before us doesn't tell us much, but what it does tell suggests this is not a needle-in-the-haystack judicial recusal case; it is quite ordinary. The thrust of the recusal argument rests on the fact that Judge Bitney accepted a Facebook friend request from a party while a case was pending, and did not disclose it. But that's rather sparse evidence from which to conclude a certain ethics violation occurred, much less a due process problem.

¶118 Broadly speaking, Facebook, like other social media, can be something one interacts with much or little. Settings may be adjusted so that one never sees notifications regarding comments or likes on one's posts. A Facebook user can have thousands of friends, but only follow the updates of a far smaller circle. And though we do know Judge Bitney was an active Facebook user, the record does not tell us anything about his interactions with Carroll herself.

8

¶119 For instance, we do not know, and therefore cannot conclude, whether Judge Bitney ever saw Carroll's domestic violence-related posts. Thus, even if those could be seen as "ex parte communications concerning a pending . . . proceeding," as the majority construes them, we have no factual findings from which we could definitively say anything like that occurred. SCR 60.04(g) (prohibiting most ex parte communications regarding a pending matter). We also cannot say, for that matter, whether Judge Bitney viewed <u>any</u> of Carroll's posts or Facebook activity while the case was pending.

¶120 It is also difficult, without more facts, to know what to read into Judge Bitney's decision to accept Carroll's Facebook friend request. Judge Bitney undoubtedly has thousands of parties before him each year. It could be he was not aware her case was pending at the time he accepted the request. It could be he routinely accepts all Facebook friend requests he receives without paying much attention to who they are from. While the record could support more problematic inferences, the record as we have it supports more innocent ones as well.

¶121 Further, we do not know if Judge Bitney was even aware that Carroll had liked his posts or whether he saw the two "get well soon" comments she left on his posts. Again, many people do not follow every comment or like on a Facebook post. Moreover, there's nothing particularly sinister about a party wishing a judge a speedy recovery from knee surgery. A similar greeting from parties or counsel while passing in the halls of the courthouse would raise no one's eyebrows. Nor would "Merry

Christmas!" or "The pastor preached a wonderful sermon on Sunday, didn't he?" These benign interactions are a routine part of being a person in a finite community.

¶122 To that point, these kinds of interactions between a judicial officer and members in the community are not that unique. Suppose Carroll and Judge Bitney were already friends on Facebook. Would liking Bible verses in his Facebook feed and wishing him a speedy recovery from knee surgery be cause to invoke the Due Process Clause? I think not. Suppose Carroll came to a "Re-Elect Judge Bitney" rally during the last election cycle and wrote a Facebook post supporting him. This would not constitute constitutional grounds for recusal either. Nor would a large campaign contribution trigger due process concerns apart from the uniquely problematic confluence of events that Caperton occasioned. 556 U.S. at 887 ("The parties point to no other instance involving judicial campaign contributions that presents a potential for bias comparable to the circumstances in this case.").

¶123 It is important to remember that judges are not isolated members of the community. They read the news. They receive unsolicited and stray comments about cases or parties. Judges may, particularly in smaller communities, know a party's family history from another case, or have heard stories from judicial colleagues about a party before them. Judges may go to church with parties before them, volunteer with the local Rotary chapter, or be former high school football teammates with a party's father. Judges are people too. And it is precisely

10

these sorts of ordinary, and generally unproblematic, life interactions that undergird the strong presumption that judges are impartial. The very concept of an impartial judiciary depends upon the belief that judges can manage through their biases, news feeds, political supporters, former co-workers, and neighbors to render decisions without fear or favor to any party.

¶124 Every member of this court would agree that Judge Bitney should have been more careful. Knowingly or not, accepting a Facebook friend request from a party while a case is pending raises an appearance of bias that judges should strive to avoid. But the claim here is that, far beyond an appearance of bias, this miscue was extreme, exceptional, and extraordinary, raising a serious risk of actual bias. Despite the majority's confident assertions, this record tells us far too little to conclude the Constitution is implicated. We as a court must not deploy the Constitution as a means to right all recusal wrongs.[3] See Caperton 556 U.S. at 903 (Scalia, J.,

---

[3] The concurrence of Justice Ann Walsh Bradley tries to take Caperton even further. She would seemingly transform many appearance of bias questions into constitutional claims. And separately, she also argues that Caperton is inconsistent with our decision in State v. Henley, 2011 WI 67, 338 Wis. 2d 610, 802 N.W.2d 175 (per curiam), confirming this court's long-standing rule leaving recusal decisions to the individual justice. In particular, she argues that the recusal decisions of justices must likewise be subject to the same objective due process review——but by the other members of this court. Henley is settled law, and there are good reasons to keep it that way.

11

dissenting) ("Divinely inspired text may contain the answers to all earthly questions, but the Due Process Clause most assuredly does not. The Court today continues its quixotic quest to right all wrongs and repair all imperfections through the Constitution."). We should therefore default to the strong presumption that Judge Bitney can withstand a hearty breeze——even what could have been attempted influence in this case by Carroll——and still not blow over.

¶125 Blurring this standard leads to the very dangers Chief Justice Roberts cautioned against in his <u>Caperton</u> dissent. All future litigants, he warned, "will assert that their case is

---

First, our recusal procedures come from good stock; they follow the United States Supreme Court's model for courts of last resort. <u>See</u> <u>Henley</u>, 338 Wis. 2d 610, ¶¶28-31 (noting the United States Supreme Court's procedure, which this court has followed for more than 150 years, was unchanged by <u>Caperton</u>). Therefore, any problem that allegedly exists here is no more acute than it is for the Supreme Court itself.

Second, the recusal decisions of individual justices on this court are reviewable in the exact same way the recusal decision here was——by a higher court. That is, litigants may appeal the recusal decisions of members of this court to the United States Supreme Court. That, of course, is exactly what happened in <u>Caperton</u>. In short, there is nothing incongruous about the existence of a due process claim and our rule allowing justices to decide for themselves whether recusal is appropriate.

The recusal wars that plagued this court for several years have concluded; I bid them good riddance. Nothing since <u>Henley</u>, which was decided after <u>Caperton</u>, demands another round of squabbling over these issues. Justice Ann Walsh Bradley is right about one thing——the integrity of our courts is at stake. Encouraging litigants to use recusal as a weapon, turning justices against one another, and casting more public doubt on the integrity of our colleagues is the only thing that will come from Justice Bradley's invitation. These zombies are best kept entombed.

12

really the most extreme thus far." Id. at 899 (Roberts, C.J., dissenting). And each new allegedly extreme case will entice the judiciary "to correct the extreme case, rather than adhering to the legal principle." Id. Sometimes, the Chief Justice reminded us, the cure is worse than the disease. Id. at 902. While trying to protect the integrity of the judiciary, the invitation to dress ordinary judicial disqualification claims as constitutional cases "will itself bring our judicial system into undeserved disrepute, and diminish the confidence of the American people in the fairness and integrity of their courts." Id.

¶126 Although this court must follow Caperton, it has no constitutional warrant to expand it. The more this court takes ordinary recusal questions and turns them into constitutional questions, the more we will see these claims. And the more we see these claims, the more recusal will become a litigation weapon (after all, a due process violation is structural error). And the more recusal becomes a litigation weapon, the more damage it does to the judiciary as a whole. The presumption that judges will follow the law regardless of their personal views and regardless of their associations is quickly being replaced by the presumption that judges are frail, impressionable, and not to be trusted. Make no mistake, today's decision will invite ever more Constitution-based recusal claims. And with it, faith in the judiciary will be undermined, not strengthened. With each new blessing of a new "just as bad as Caperton" recusal claim, the judiciary continues its

13

constitutional takeover of new areas of law that the people, through their written Constitution, left to themselves.

¶127 Nothing in the original public meaning of our Constitution nor in Supreme Court precedent requires us to transform Judge Bitney's social media misstep into a constitutional controversy. I respectfully dissent.

¶128 I am authorized to state that Justices REBECCA GRASSL BRADLEY and DANIEL KELLY join this dissent except for footnote 1 and ¶¶120-24, but they do join footnote 3.